# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | 8:08CR222 |
| vs. | ) | REPORT AND |
| NANCY MARTIN PEREZ and EDDIE GARCIA, | ) | RECOMMENDATION |
| Defendants. | ) | |

This matter is before the court on motions to suppress by defendants Nancy Martin Perez (Perez) and Eddie Garcia (Garcia). **See** Filing Nos. 31 and 42. Perez and Garcia are charged in the Indictment with possession with the intent to distribute at least 100 kilograms but less than 1,000 kilograms of marijuana on or about June 5, 2008, (Count I) in violation of 21 U.S.C. § 841(a)(1) and (b)(1). **See** Filing No. 17. Perez seeks to suppress all evidence obtained by law enforcement officers following the traffic stop that occurred on June 5, 2008. **See** Filing No. 31. Garcia seeks to suppress the physical evidence seized during the above-mentioned traffic stop and any statement made by Garcia to government agents subsequent to his arrest. **See** Filing No. 42.

On September 3, 2008, the court held a consolidated evidentiary hearing on both motions. Perez was present with her counsel Brian S. Munnelly. Garcia was present with his counsel, Assistant Public Defender Michael F. Maloney and David Tarrell. Assistant United States Attorney Susan Lehr represented the United States. During the hearing, the court heard the testimony of Omaha Police Department (OPD) Officer Aaron Hanson (Officer Hanson) and Drug Enforcement Agency (DEA) Special Agent Quinn Auten (Agent Auten). At the hearing, the court received into evidence a photograph of the view obstruction attached to the inside of the windshield (Exhibit 2) and a video disk of the traffic stop (Exhibit 3). A transcript (TR.) of the hearing was filed on September 10, 2008. **See** Filing No. 51 - Transcript. Perez filed pre-hearing and post-hearing briefs in support of her motion. **See** Filing Nos. 32 and 54. Garcia filed a post-hearing brief in support of his motion. **See** Filing No. 58. The government filed a pre-hearing brief opposing both

motions. **See** Filing No. 45. The motions were deemed submitted on November 12, 2008.[1]

## FINDINGS OF FACT

Officer Hanson has been a police officer for the City of Omaha since 1996 and has been assigned to the OPD canine unit since March of 2000 (TR. 4-5). On June 5, 2008, at 1:54 p.m., while on patrol, Officer Hanson observed a white Ford F-350 with Colorado plates pulling a white enclosed trailer driving east on I-80 (TR. 6-7, 11; Ex. 3). As he was passing the vehicle, Officer Hanson's attention was drawn to a large view obstruction hanging from the windshield (TR. 7). At 1:55 p.m., Officer Hanson initiated a traffic stop and pulled the vehicle over on eastbound I-80 near the 60th Street ramp (TR. 11; Ex. 3).

When Officer Hanson approached the passenger side of the vehicle, he observed two occupants: a driver and a passenger (TR. 11-12). Officer Hanson saw items attached to the windshield by a suction cup near the rear view mirror (TR. 9-10). The items included a small bear and a "dream catcher" with feathers, approximately 14 inches in length (Ex. 2; Ex. 3 at 14:51). Officer Hanson advised the occupants of the reason for the stop and explained the potential danger of an obstructed view (TR. 40). Officer Hanson requested the occupants' identification and paperwork for the vehicle (TR. 12). The driver, identified as Garcia, provided an Arizona identification, the vehicle registration, and proof of insurance; the passenger, identified as Perez, provided a California identification (TR. 12-13). To safely continue questioning Garcia and to effectively hear his responses, Officer Hanson asked Garcia to exit the vehicle and meet him behind the trailer (TR. 13-14). While at the rear of the trailer, Officer Hanson asked Garcia who owned the trailer; however, Garcia stated he knew only the owner's first name (TR. 14). Officer Hanson also inquired about the contents of the trailer and Garcia indicated it contained a table, sink and other restaurant-type equipment (TR. 15, 20). Officer Hanson asked Garcia about his travel plans and Garcia stated they were going to Des Moines and were starting a restaurant there (TR. 14, 20).

---

[1] The court allowed the government time until November 12, 2008, to file a reply brief.

At 2:01 p.m., Officer Hanson returned to the stopped vehicle to compare the vehicle identification number (VIN) to the registration (TR. 15; Ex. 3). While checking the VIN, Officer Hanson engaged Perez in conversation (TR. 15). He asked Perez where they were going and she stated they were traveling to somewhere in Illinois (TR. 15). Perez also indicated they would be staying in Illinois for two months; however, Officer Hanson noticed their luggage consisted of only two duffel bags, which seemed to him inconsistent with the stated length of stay (TR. 16). When Officer Hanson asked Perez why they had so little luggage for a two-month stay, Perez stated they were staying with friends and did not need much (TR. 16).

At approximately 2:04 p.m., Officer Hanson conducted local and CCH data checks on Garcia and Perez (TR. 17; Ex. 3). A local data check provides officers with local driving status and any local criminal history, while a CCH data check is a national check that alerts officers to any wants or warrants or criminal history in other jurisdictions (TR. 17). While waiting for the checks, Officer Hanson asked Garcia if he had the keys to the trailer (TR. 18). Garcia informed Officer Hanson the keys to the trailer were in the truck (TR. 19). Officer Hanson retrieved the keys and handed them to Garcia while asking additional clarifying questions about Garcia's travel plans and some differences between Garcia's and Perez's accounts (TR. 19; Ex. 3). At 2:07 p.m., Officer Hanson asked Garcia if they could "take a quick peek" in the trailer; Garcia responded "sure, sure," walked toward, unlocked and opened the trailer (TR. 19; Ex. 3). Officer Hanson did not inform Garcia he had the right to refuse the request to search (TR. 41). Garcia and Officer Hanson looked inside the trailer and discussed the contents from outside (TR. 19; Ex. 3). Officer Hanson observed a table, a sink, and other heavy, metal objects that did not appear to Officer Hanson to be valuable (TR. 19-21). After looking inside for about 30 seconds, Garcia closed up the trailer (TR. 22).

Officer Hanson received partial results from the data checks, but at 2:11 p.m., he was required to repeat Garcia's license information for Arizona (TR. 22-23; Ex. 3). While he was waiting for the check to process, he returned to his vehicle and made two phone calls related to the traffic stop (TR. 22-23, 27; Ex. 3). Officer Hanson called the El Paso Intelligence Center (EPIC) and the Omaha dispatcher (TR. 23-24). Officer Hanson called

EPIC because he suspected criminal activity was involved in this stop (TR. 24). Officer Hanson was instructed by radio to call the operator running the CCH check (TR. 24-25). OPD policy dictates that operators do not relay information by radio about felony charges beyond radio code (TR. 26). At 2:16 p.m., Officer Hanson called the operator who conducted the CCH check and was informed Garcia had a felony criminal history for possession of a controlled substance for which he spent two years in prison (TR. 25; Ex. 3). Garcia had previously disclosed this fact to Officer Hanson (TR. 25). The operator also stated Perez had a recent conviction for attempted murder (TR. 25).

At 2:20 p.m., Officer Hanson exited his vehicle and handed the vehicle paperwork and identifications back to Garcia (TR. 27; Ex. 3). Only a matter of seconds passed between the time Officer Hanson completed the background check and the time Officer Hanson returned Garcia's paperwork and issued the warning (TR. 27). Officer Hanson informed Garcia he was giving him a verbal warning for the offense (TR. 27-28). Garcia then asked Officer Hanson about the location of a pharmacy due to a problem he had with his eye (Ex. 3). The two men then shook hands and Garcia started to walk away (TR. 28; Ex. 3). However, Officer Hanson did not tell Garcia he was free to leave (TR. 41).

At 2:21 p.m., Officer Hanson said, "I have another question for you, if you don't mind?" (TR. 28; Ex. 3). Garcia responded affirmatively by stopping and leaning in toward Officer Hanson (TR. 28; Ex. 3). Officer Hanson asked Garcia if he had any contraband, drugs, bombs, guns, or cash in the vehicle or trailer; Garcia responded by saying "no" to each question except that he had cash for gas money (TR. 28; Ex. 3).

At 2:22 p.m., Officer Hanson said, "I'd like to search your truck and trailer to make sure there is no [contraband] . . . because we have such a huge problem on this interstate" (TR. 29; Ex. 3). Garcia responded "ok, ok, sure," and waived his hand toward the trailer (TR. 29; Ex. 3). Officer Hanson directed Garcia to a safe position off of the roadway while Officer Hanson conducted the search (TR. 29). At this point, Garcia was not handcuffed nor placed under arrest (TR. 29). At 2:23 p.m., Officer Hanson approached Perez, informed her the pair was free to go, but Garcia had consented to a search of the truck and trailer (TR. 29; Ex. 3). Officer Hanson asked Perez if there was any contraband in the truck or trailer and she said, "no, nothing" (Ex. 3). Officer Hanson asked if he had Perez's

4

permission to search the truck and trailer and she said "yes" (TR. 29; Ex. 3). Officer Hanson directed Perez to Garcia's position off of the roadway for safety (TR. 30). She was not handcuffed (TR. 30). Neither Garcia nor Perez signed a permission form for the search; however, OPD policy does not require officers to utilize such forms when conducting a search (TR. 31).

Officer Hanson called to Garcia to bring the keys to the vehicle and trailer and Garcia complied (TR. 31; Ex. 3). At 2:25 p.m., Officer Hanson opened the trailer (TR. 31-32; Ex. 3). Using a flashlight, Officer Hanson knocked on the exterior trailer walls to test for density and conformity (TR. 33). When Officer Hanson rapped the flashlight on the exterior walls near the front of the trailer, the sound changed from a hollow ring to a "thick thud-type sound" (TR. 33; Ex. 3). Officer Hanson also observed that the front exterior wall of the trailer appeared have a bump or to bow-out (TR. 34; Ex. 3). By this time, Sergeant Steve Worley and Officer Steve Venteicher arrived to assist Officer Hanson (TR. 33-34). Officer Venteicher watched Perez and Garcia while Sergeant Worley assisted Officer Hanson in the search (TR. 34). At 2:31 p.m., Officer Hanson and Sergeant Worley measured the interior and exterior lengths of the trailer walls and found the exterior wall was a foot and a half longer than the interior wall (TR. 34; Ex. 3).

Officer Hanson and Sergeant Worley entered the trailer and moved aside the metal items to reach the interior front wall of the trailer (TR. 34-35). Officer Hanson thought the interior of the trailer had been altered to appear as though the front wall was a factory wall (TR. 36). Officer Hanson used tools to remove the non-factory wall (TR. 35). At 2:35 p.m. as he was removing the first screws in the process, Officer Hanson could smell the odor of marijuana (TR. 35-36; Ex. 3). Officer Hanson did not inform Garcia he would be dismantling the trailer (TR. 43). Removing the non-factory wall exposed a second layer of the wall (TR. 35). At 2:48 p.m., Officer Hanson finished removing screws from the second layer, pulled it back and found a framed room between the non-factory front wall and the nose of the trailer (TR. 36, 43; Ex. 3). Inside the framed area, Officer Hanson observed packages; he cut into a package with a knife and determined the packages contained marijuana (TR. 35-37). Officer Hanson alerted the other officers to his discovery and at 2:49 p.m., Officer Hanson placed Garcia and Perez under arrest (TR. 37; Ex. 3). Officer

Hanson advised Garcia of his *Miranda* rights and placed him in the front passenger seat of his police vehicle (TR. 38; Ex. 3 14:52). Officer Hanson asked if Garcia understood his rights and would agree talk to him more about what was found in the trailer later and Garcia stated "sure" (Ex. 3). Officer Hanson did not advise Perez of her rights, but had limited contact with her after the arrest (TR. 38). The truck and trailer were transported by Officer Venteicher to the OPD impound lot (TR. 37).

Agent Auten has been a special agent with the DEA since September 2005, and has been assigned to the Omaha district since December 2005 (TR. 65). Following the above June 5th traffic stop by Officer Hanson, Agent Auten proceeded to the OPD impound lot to assist (TR. 65-67). Agent Auten was briefly introduced to Perez and Garcia, who were being held in separate automobile bays at the lot (TR. 66-67). During Agent Auten's brief introduction to Perez she indicated she had no knowledge of what was going on or what was found in the trailer; no other direct questions were posed to Perez by Agent Auten at that time (TR. 67). At this point, Perez was not advised of her *Miranda* rights (TR. 80). With the assistance of an Officer Hunter, Agent Auten accompanied Garcia to a kitchen-type area of the facility (TR. 66). Garcia was again advised of his rights and indicated he wanted to speak to Agent Auten and gave a statement (TR. 66).

After speaking with Garcia, Agent Auten believed other parties were awaiting the arrival of the truck and trailer in Des Moines and Garcia agreed to assist Agent Auten in a controlled delivery (TR. 68). Agent Auten explained this to Perez and she indicated she wanted to help in any way she could (TR. 68-69). At this point, both Garcia and Perez understood they were under arrest and that marijuana had been found in the trailer (TR. 68). Agent Auten, accompanied by Task Force Officer Brandon West (Officer West), drove Garcia and Perez towards Des Moines (TR. 69). Agent Frank Feden followed with the truck and trailer (TR. 70). During the drive, Agent Auten had casual conversations with Perez, who was in the front seat, including small talk about the weather (TR. 67, 71).

Agent Auten met agents from the Des Moines DEA office at a gas station in Stuart, Iowa, approximately halfway to Des Moines (TR. 70). The truck and trailer, which had been restored of its contents, were transferred with Garcia and Perez into the custody of the Des Moines DEA agents (TR. 70). Agent Auten and the other Omaha agents returned

to Omaha (TR. 70-71). The next day, June 6, 2008, Agent Auten received a phone call from the Des Moines office indicating the Des Moines agents had decided to forgo any attempt at a controlled delivery (TR. 71). The Des Moines agents had been informed by Perez that Des Moines was not the ultimate destination for the marijuana (TR. 71).

Agent Auten sent Agent James Wahle and Task Force Officers Dennis O'Connor and West to retrieve Garcia, Perez, and the vehicles (TR. 72). Agent Auten spoke on the phone with Agent Wahle, who was with Perez (TR. 72-73). Perez identified herself over the phone and Agent Auten recognized her voice (TR. 72). Perez said she remembered Agent Auten and recognized his voice (TR. 73). During the phone conversation, Agent Wahle indicated he was reading from a "DEA 13 yellow *Miranda* rights advisory card," which Agent Auten also possessed and followed along with while Agent Wahle advised Perez of her *Miranda* rights and the responses (TR. 73-75). Prior to this point, Perez had not been advised of her *Miranda* rights (TR. 80). Agent Wahle read the card line-by-line and Perez stated she understood each of her rights and she was willing to answer some questions (TR. 73-75). Agent Auten had only one question, which Perez answered (TR. 76). Agent Auten was able to clearly understand Perez and believed she understood him (TR. 75-76).

## LEGAL ANALYSIS

### A. Traffic Stop

Garcia asserts Officer Hanson had neither reasonable suspicion nor probable cause to effectuate the traffic stop on June 5, 2008. **See** Filing No. 42, p. 1. Perez also contends no probable cause existed to believe even a minor traffic infraction occurred. **See** Filing No. 32, p. 3. However, a law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Officer Hanson observed the vehicle driven by Garcia with a view obstruction hanging from the windshield, in violation of Neb. Rev. Stat. § 60-6,256 (TR. 7, 9; Ex. 2). The court credits the testimony of Officer Hanson regarding this violation. The defendants do not deny there were items hanging from the rear view mirror, including a small stuff bear and a dream catcher with

feathers (Ex. 2). "'[A]ny object' that obstructs a clear and full view through the windshield violates Nebraska law." **See** *United States v. Ramos-Caraballo*, 375 F.3d 797, 801 (8th Cir. 2004) (air freshener hanging from rear view mirror justified traffic stop). Accordingly, Officer Hanson had probable cause on June 5, 2008, to conduct a traffic stop on the vehicle driven by Garcia.

**B.     Detention**

Garcia asserts Officer Hanson detained him longer than necessary to warn him about the windshield obstruction and that Officer Hanson prolonged the detention by asking non-routine questions unrelated to the windshield obstruction. **See** Filing Nos. 42, p. 1 and 58, p. 3. Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *Untied States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (**quoting** *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. *Peralez*, 526 F.3d at 1119; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *United States v. $404,905.00*,182 F.3d 296, 647 (8th Cir. 1999). In any event, the scope and length of any investigation must be reasonable. *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "The

8

investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir.1994) (en banc)).

Garcia relies on *Peralez* to argue it is violative of the Fourth Amendment for police officers to ask non-routine questions to extend a traffic stop "beyond the time reasonably required" to complete its purpose. *Peralez*, 526 F.3d at 1121. However, the current case is distinguishable from *Peralez*. In *Peralez*, the investigating trooper utilized a "blended process" of investigating the stop and asking drug interdiction questions. *Id.* at 1120. However, the trooper told the driver he would issue only a warning ticket approximately three minutes into the sixteen-minute traffic stop. *Id.* at 1119. Hence, the *Peralez* court found the inclusion of the trooper's drug interdiction questions, after deciding to issue a warning, more than doubled the time of the detention. *Id.* at 1121. *Peralez* did not involve independent justification for prolonging the traffic stop such as reasonable suspicion of other criminal activity or consent. *Id.*

Here, the length of the traffic stop was directly related to Officer Hanson's performance of routine tasks. Upon receiving Garcia and Perez's identifications, Officer Hanson conducted checks on their driving records and criminal histories. Officer Hanson also asked questions about the ownership and contents of the truck and trailer, as well as the travel plans of Garcia and Perez. Officer Hanson asked to look in the trailer and Garcia granted him permission. These inquires and tasks are all permitted in the course of a routine traffic stop. Furthermore, Officer Hanson spent some time attempting to determine the ownership of the vehicle and clear up inconsistent statements made by Garcia and Perez. The traffic stop concluded at 2:21 p.m. when Officer Hanson issued the warning. The warning was issued within moments of receiving information on the background checks, which began at 2:04 p.m. The traffic stop lasted approximately 25 minutes until Officer Hanson issued the warning. Such length of time was reasonable to effectuate the routine tasks associated with the traffic stop, under the circumstances, and was not prolonged by questioning unrelated to the stop.

In any event, Officer Hanson did become increasingly suspicious of criminal activity tangential to the windshield obstruction. Officer Hanson indicated a number of factors that led to such suspicions, including the divergent information from Garcia and Perez, the limited amount of luggage for a purported two-month stay, the apparent value of the contents of the trailer, and the criminal records of Garcia and Perez. Officer Hanson's inquiry before initiating the information checks and during the time he was waiting for the information to return did not prolong the detention, or in the alternative, was justified by his increasing suspicion of criminal activity.

Even without reasonable suspicion, an officer may ask questions unrelated to the traffic stop during a post-stop consensual encounter. *United States v. Esquivel*, 507 F.3d 1154, 1159 (8th Cir. 2007). After returning the paperwork and indicating Garcia would only receive a verbal warning about the windshield obstruction, the two men shook hands and Garcia started to leave (TR. 28; Ex. 3). Officer Hanson then asked if Garcia would answer another question and Garcia responded affirmatively by stopping and leaning in toward Officer Hanson (TR. 28; Ex. 3). At that time Officer Hanson asked Garcia addition questions including questions about carrying contraband and requested permission to search. The court finds the initial post-stop questions posed by Officer Hanson took place during a consensual encounter with Garcia.

**C.    Search**

The defendants contend the search of the trailer was conducted without valid consent or a warrant in violation of their Fourth Amendment rights. **See** Filing No. 42, p. 2-3; Filing No. 31, p. 2. The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; **see** *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to the states through the Fourteenth Amendment.). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005).

A consent search must be voluntary. The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See** *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.* (**citing** *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007). Observations made during the consensual search of a vehicle may give the officers probable cause to believe that there is contraband in the vehicle, thus lawfully expanding the scope of search under the automobile exception to the warrant requirement. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000).

After Officer Hanson informed Garcia that Garcia would receive a verbal warning for the windshield obstruction, the two men shook hands. Officer Hanson then asked Garcia if he would mind answering a few more questions; Garcia agreed. At that time

11

Officer Hanson asked Garcia addition questions including questions about carrying contraband and requested permission to search. Specifically, Officer Hanson said, "I'd like to search your truck and trailer to make sure there is no [contraband]" (TR. 29; Ex. 3). Garcia responded "ok, ok, sure," and waived his hand toward the trailer (TR. 29; Ex. 3). Initially, Garcia relocated away from the trailer, but later gave the key to the trailer to Officer Hanson to enable Officer Hanson to open the trailer. There is no evidence of threat, intimidation or coercion. Garcia was of sufficient age and intelligence and was not under the influence of drugs or alcohol. Garcia had prior arrest experience and Officer Hanson did not make any promises or misrepresentations upon which Garcia relied. Garcia was not under arrest and did not object to the search at any time after giving consent. Additionally, Officer Hanson received independent consent to search the truck and trailer from Perez. Therefore, the court finds the defendants voluntarily gave consent to search.

After consent was given, Officer Hanson made several observations that led him to believe there was contraband in the trailer. These observations include the change in sound audible to Officer Hanson as he tested the density of the trailer walls, the bowing appearance of front exterior trailer wall, the difference in lengths between the exterior and interior trailer walls, and the appearance of alterations to the interior trailer walls. These observations were sufficient to give Officer Hanson probable cause that there was contraband in the vehicle and thereby expand the search automobile exception to the warrant requirement. In any event, Officer Hanson smelled the odor of marijuana as he began to remove screws in an attempt to verify there was a false wall inside the trailer (TR. 35-36; Ex. 3).

The defendants argue the officer impermissibly expanded the scope of the search to include destruction of property. The scope of a consensual search is measured by what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object," but a person may limit the scope of a consensual search. *Id.* at 251-52. The Fourth Amendment is not violated when "it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open a particular container within the automobile." *Id.* at 249. In this case

there is no evidence the consent to search was limited in any way. The officers did not open any container for which consent to search was denied. Arguably, a reasonable person would not have understood the exchange between Officer Hanson and either Perez or Garcia to include destruction of property. **See** *United States v. Santana-Aguirre*, 537 F.3d 929, 932 (8th Cir. 2008) ("Consensual searches generally cannot be destructive."). However, an officer may constitutionally expand the scope of a search under some circumstances.

Observations made during the consensual search of a vehicle may give the officers probable cause to believe that there is contraband in the vehicle, thus lawfully expanding the scope of search under the automobile exception to the warrant requirement. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000). "The warrantless search of an automobile, predicated on consent, may be expanded beyond the scope of the consent when it yields a basis for a reasonable articulable suspicion that additional contraband may be found in parts of the car not included in the consent." *Alverez*, 235 F.3d at 1089 (citation omitted); **see** *United States v. Ross*, 456 U.S. 798, 823 (1982). The evidence suggests officers removed screws to expose an interior compartment containing contraband, rather than cutting or destroying the property. **Compare** *Santana-Aguirre*, 537 F.3d at 932 (finding breaking of candles was unjustified by consent, but supported by probable cause). Officer Hanson's observations during the consent search provided probable cause to expand the search to include removal of the non-factory wall inside the trailer. Accordingly, the court finds the scope of the consensual search was constitutionally expanded.

### D.  STATEMENTS

The defendants challenge the admissibility of the statements they made to officers in connection to the June 5, 2008 traffic stop. Garcia argues that, although he was properly ***Mirandized***, his statements were not sufficiently attenuated to overcome the taint of an illegal stop and search. **See** Filing No. 42, p. 3. Garcia does not otherwise challenge the voluntariness of his statements. Because the court found the stop and search were valid, it is unnecessary to examine the admissibility of Garcia's statements;

the court concludes Garcia was properly *Mirandized* and his statements are admissible. In contrast, Perez contends she did not validly waive her *Miranda* rights and that her statements were not freely and voluntarily given. **See** Filing No. 31.

The Self-Incrimination Clause provides: "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal marks omitted). The court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). However, a defendant may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S.

at 444. To determine whether *Miranda* rights have been waived voluntarily, knowingly, and intelligently, the totality of the circumstances must show "both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 435 U.S. 412, 421 (1986).

Here, there was a formal arrest and restraint on Perez's freedom of movement after the discovery of contraband. After the arrest, Perez was clearly in police custody. There is no evidence Perez was subject to interrogation prior to June 6, 2008. Agent Auten interrogated Perez on June 6, 2008. At the time of her interrogation, Perez was not free to leave, nor would she have felt free to leave. However, prior to this custodial interrogation, Agent Wahle advised Perez of her *Miranda* rights. Perez acknowledged she understood each of her *Miranda* rights and that she was willing to answer questions. There is no evidence the wavier was coerced. The court finds Perez's post-*Miranda* waiver, on June 6, 2008, was voluntary. Any evidence obtained from Perez during the custodial interrogation is admissible. For the reasons stated above, each of the motions to suppress should be denied in its entirety.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**
1. Nancy Martin Perez's Motion to Suppress (Filing No. 31) be denied.
2. Eddie Garcia's Motion to Suppress (Filing No. 42) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 2nd day of December, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge